# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **THE ESTATE OF MARILYN MONROE LLC,** *Plaintiff*, v. **18_Jewellery,** *et al.*, *Defendants.* | **SEALED** Civil Action No. |

# DECLARATION OF JEFFREY B. SLADKUS

I, Jeffrey B. Sladkus, declare and state as follows:

## I.   Background

1)   The following Declaration is made on my personal knowledge and information, as well as my review of relevant documents, and, if called upon to do so, I could and would capably testify to the following facts set forth below.

2)   I am an attorney duly authorized and licensed to practice law in the State of Georgia.  I have been practicing as a trademark and copyright attorney since at least as early as 2001, and I am the Managing Partner of The Sladkus Law Group, counsel of record for The Estate of Marilyn Monroe LLC ("Plaintiff") in the above captioned action.

3)   I have represented, and continue to represent, numerous owners of well-known brands against sellers of counterfeit and infringing products.

4)   Online sales of counterfeit and infringing goods are a major problem for these brand owners.  I have been retained by Plaintiff to help locate and pursue merchants on some of the most popular e-commerce marketplaces, such as Alibaba, AliExpress, Amazon, DHGate, eBay, Etsy, Joom, Printerval, Temu, Walmart, and Wish ("Marketplaces"), that are selling unauthorized copies of Plaintiff's goods bearing counterfeit or infringing marks.

5) I routinely engage and assist in the enforcement of my clients' IP rights against counterfeiters, including by registering copyrights and trademarks with U.S. Customs and Border Protection ("CBP"), assisting CBP with the identification, review, and seizure of counterfeit goods, sending demand letters directly to infringers and internet service providers, filing domain name disputes against infringing websites, assisting with or utilizing the notice-and-takedown procedures for social media platforms such as Facebook, and assisting with or utilizing notice-and-takedown procedures to report intellectual property right ("IPR") infringements directly to the Marketplaces.

## II.  Investigation of Defendants

6) There are currently scores of virtual storefronts operating on the various Marketplaces selling counterfeit or infringing goods bearing the Plaintiff's Marks. The Marketplaces allow individuals or companies to establish these virtual storefronts where they can then market, sell, and ship a variety of goods to consumers in the United States (each a "Store").

7) On behalf of Plaintiff, I personally investigated the marketing, promotion, and offering for sale of counterfeit and/or infringing goods in the various Marketplaces by Defendants. Each Defendant has advertised and overtly offered for sale to prospective purchasers in the United States unauthorized goods

bearing counterfeit and/or infringing copies of Plaintiff's Marks. Using a suitable pretext, our firm searched for Plaintiff's branded goods on the various Marketplaces, identified Stores advertising merchandise bearing counterfeit and/or infringing copies of Plaintiff's Marks, and confirmed that each of the Stores was willing and able to ship these counterfeit and/or infringing goods to the United States. Each of the Marketplaces accepts payment on behalf of the Stores for these goods in U.S. dollars. Each Defendant advertised its willingness and ability to sell these counterfeit and infringing goods to customers in the United States, including in this judicial district, thereby purposefully directing its commercial activities here. In fact, Stores will frequently feature "customer feedback" sections that specifically highlight reviews based on sales made to customers in the United States.

8)   As part of the investigative process, my firm has assembled web page captures evidencing each Defendant's offer for sale and/or sale of goods bearing counterfeit and/or infringing copies of one or more of Plaintiff's Marks. The web page captures also establish each Defendant's marketing, offering for sale, and offering to ship these counterfeit and/or infringing goods to consumers in the United States, together with images of the counterfeit and/or infringing goods that were prominently displayed by Defendants as sample goods in their Stores. Many

of the Stores use the identical pictures and descriptions to advertise the sale of their counterfeit and/or infringing goods. This evidence can and will be made available to the Court and any Defendant upon request; the volume and electronic file size makes it impracticable to file it through the Court's CM/ECF platform.

9) Based on my first-hand knowledge of similar cases I have prosecuted, the Marketplaces can and will comply with a temporary restraining order of the type requested by Plaintiff.

### III. Need for *Ex Parte* Relief and Service by Electronic Means

10) The Marketplaces usually provide a mechanism for reporting IPR infringements. However, the current notice-and-takedown procedures in place by the various Marketplaces to report IPR infringements are ineffective long term. These takedowns have little deterrence value to the infringers and result in nothing more than a minor inconvenience.

11) In my experience, a Marketplace will usually take infringing products down within one week of receiving notice of an IPR infringement. However, because there are no real penalties or restrictions imposed upon the seller whose listing is taken down, sellers often quickly relist the infringing and/or counterfeit goods on the same Store or establish a new Store under a new identity and resume selling the infringing and/or counterfeit goods. If a Marketplace bans a particular

seller because of repeat IPR infringement complaints, the seller can easily establish a new identity, set up a new Store, and resume selling counterfeit and/or infringing goods on the Marketplace in little time.

12) The persistent nature of online counterfeiting and long-term ineffectiveness of standard notice-and-takedown procedures is well documented. Referred to colloquially as the "whack-a-mole" problem, once an infringing listing is taken down pursuant to a takedown notice, another infringing listing tends to "pop-up" to take its place.[1] Thus, rights holders are faced with either perpetually sending takedown notices or resigning themselves to the pervasiveness of the infringement.

---

[1] *See e.g.* Gaston Kroub, *Mass Counterfeiting Whack-a-Mole*, Above the Law, Jan. 21, 2020, https://abovethelaw.com/2020/01/mass-counterfeiting-whack-a-mole/; Kimball, Spencer, *US small businesses are fighting an uphill battle against counterfeiters in China: 'It's like whack-a-mole'*, CNBC, Oct. 9, 2019, https://www.cnbc.com/2019/10/06/how-us-small-businesses-are-fighting-counterfeiting-in-china.html; Taylor, Ken, *Member Spotlight: Adobe Inc. Focuses Corporate Social Responsibility Efforts on Education, Environment, and Community*, International Trademark Association (INTA), Jan. 15, 2020, https://www.inta.org/member-spotlight-adobe-inc-focuses-corporate-social-responsibility-efforts-on-education-environment-and-community/; Hsiao, Amy, *Fighting Online Counterfeits in China – Tips to Avoid a "Whack-a-Mole" Game*, Last Week in China, Jan. 31, 2020, https://www.lastweekinchina.com/home/fighting-online-counterfeits-in-china; Ray, James, *Trademark Enforcement: A more nuanced game than whack-a-mole*, IP Watchdog, Oct. 23, 2018, https://www.ipwatchdog.com/2018/10/23/trademark-enforcement-whack-a-mole/id=102344/; Mostert, Dr. Frederick, *Study on Approaches to Online Trademark Infringements*, World Intellectual Property Organization (WIPO) Advisory Committee on Enforcement, Sep. 1, 2017, https://www.wipo.int/edocs/mdocs/enforcement/en/wipo_ace_12/wipo_ace_12_9_rev_2.pdf.

13) In our experience, most Marketplace sellers do not provide complete or accurate physical contact information regarding themselves or their Store. Some Marketplaces even allow sellers to operate with complete anonymity and do not disclose any information about the seller or the Store whatsoever.

14) I have sent countless demand letters to substantially similar merchants located in China. These merchants rarely, if ever, publish an accurate identity, physical address, or other contact information. Moreover, when they do purport to provide a business address, it is usually either incomplete or false. In my many years of representing IPR owners, I have yet to receive a response to a demand letter sent to an individual or company in China that was sent to the published address.

15) The contact information typically published by a seller in any Marketplace is rarely complete, and while the published information might lead to a certain city or region in China, there is rarely, if ever, the type of specific physical location information required to successfully deliver a demand letter, let alone effectuate personal service.[2] Some platforms do not even require users to provide their actual name and a physical address.

---

[2] *See* Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. Int'l L. & Bus. 157, 186 (2020) ("Current e-commerce platforms, including Alibaba and Amazon, do not subject new sellers to adequate verification or confirmation . . . *counterfeiters*

16) With such anonymity, sellers like Defendants are then able to market, advertise, and sell counterfeit and infringing goods without any risk of an adverse judgment. This also allows sellers like Defendants to destroy any evidence of their unlawful conduct and to transfer or withdraw funds in the event of a legal proceeding.

17) Additionally, counterfeiters routinely monitor electronic court dockets for new anti-counterfeiting actions and communicate with sellers like Defendants through various social networks and message forums, including sellerdefense.cn, alerting these sellers to pending actions and affording these sellers the opportunity to take down their existing Store, empty Marketplace escrow accounts, and destroy all evidence of their counterfeiting activity before a TRO or asset freeze can be put in place.

18) This firm has discovered that counterfeiters have begun monitoring electronic court dockets specifically for filings from The Sladkus Law Group in an effort to learn of potential anti-counterfeiting actions before a plaintiff's motion for

---

*routinely use false or inaccurate names and addresses when registering with these e-commerce platforms. When brand owners pursue counterfeiters in enforcement actions, they discover that names and addresses are fictional, and the counterfeiters then disappear into the vast expanse of cyberspace.*") (Emphasis added.) *See also, Combating Trafficking in Counterfeit and Pirated Goods, Report to the President of the United States*, January 24, 2020, https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf ("A key underlying problem here is that on at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling.")

8

TRO can be heard by the Court. Counterfeiters then share information and details from initial court filings with other sellers and provide one another with directions and instructions on counter-measures to evade account freezes and protect funds obtained from the sale of counterfeit goods. Examples of counterfeiters' communications through sellerdefense.cn related to our firm's filings are attached hereto as Exhibit 1.

19) Therefore, due to the incomplete public information and/or virtual anonymity afforded to these sellers, coupled with these sellers' capacity for monitoring electronic dockets to obtain advance notice of pending litigation, successfully shutting down these sellers and affording an aggrieved party the opportunity to obtain some type of remedy under the prevailing U.S. trademark laws requires that the target remains unaware that they are the subject of anti-counterfeiting measures; otherwise, the second one of these sellers catches wind of an investigation, they will disappear without a trace.

20) Counterfeiters who are made aware of pending legal action are known to abscond with their counterfeit goods and/or other assets to avoid liability. Our clients have experienced this first-hand. For example, one of our clients pursued a counterfeiter for years across various cities in China. When the client's representatives originally started to close in on him and/or the factories he was

using to make the counterfeit products, they were unable to find him, and the factories claimed that they were bankrupt and that the machines used to make the counterfeit products were gone. Years later, the same counterfeiter was found in a new city in China manufacturing counterfeit products at a new facility. He was eventually apprehended by law enforcement officers. However, in the time that he was missing, our client estimates that approximately 500,000 counterfeit products were distributed.

21) In a different matter, one of our clients pursued two individuals and brought civil claims against them in China. The matter ultimately settled, and the individuals agreed to cease their infringement. However, a few months later, the same individuals were found to be engaging in the same counterfeiting activity. A Chinese Court ordered seizure of their bank accounts, but the accounts were eventually released. When our client tried to obtain the previously seized funds, the money was gone.

22) These experiences are not unique. These types of evasive activities are well documented. It is exactly because of counterfeiters' tendency to disappear and

destroy evidence that the Lanham Act was amended to provide for *ex parte* seizure orders under 15 U.S.C. § 1116.[3]

23) I have only ever received responses to demand letters sent to merchants in China after I emailed a copy of the correspondence to the infringer – and only when a valid email address has been provided.

24) Based on my first-hand knowledge of similar cases I have prosecuted, the overwhelming majority of the defendants in these cases are able to be successfully served with process and other documents via the email addresses on file with the Marketplaces and/or through the Marketplaces' built-in messaging systems. Generally, almost immediately after being served electronically via either

---

[3] Joint Statement on Trademark Counterfeiting Legislation Part G, 130 Cong. Rec. H12076, H12078 (daily ed. Oct. 10, 1984) ("Testimony before both the House and Senate Judiciary Committees established that many of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon. The ex parte seizure procedure is intended to thwart this bad faith tactic . . . ."), available at https://www.justice.gov/archives/jm/criminal-resource-manual-1711-joint-statement-part-g-ex-parte-seizures. *See also e.g.* Lucas G. Paglia & Mark A. Rush, *End Game: The Ex Parte Seizure Process and the Battle Against Bootleggers*, 4 VAND. J. ENT. L. & PRAC. 4, 5 (2002) ("If apprised in advance of a pending motion for injunction, counterfeiters invariably leave with their illicit merchandise and either relocate to a venue beyond the jurisdiction of the court or simply wait until their pursuers have abandoned the cause before restarting their illegal businesses."); Steven N. Baker and Matthew Lee Fesak, *Who Cares About the Counterfeiters? How the Fight Against Counterfeiting Has Become an In Rem Process*, 83 St. John's Law Review 735 (2009), ("Counterfeiters . . . would often destroy any counterfeit goods in their possession the moment they were placed on notice of legal proceedings[,]") available at https://scholarship.law.stjohns.edu/cgi/viewcontent.cgi?article=1053&context=lawreview.

of those two methods, the majority of the defendants contact us either directly or through counsel to try to settle the lawsuit.

25) Additionally, the Marketplaces themselves advise the defendants of the lawsuit, temporary restraining order, and asset freeze when removing the offending product listings. Thus, even in the rare instances when one of our formal service emails is returned as "undeliverable," we are confident that the defendant at issue has received notice of the lawsuit and Court orders. Indeed, we are often contacted by the defendant or his/her counsel to try to resolve the dispute.

26) The above demonstrates that the most effective and reliable way to communicate with these defendants is electronically, via the email addresses on file with the Marketplaces and/or through the Marketplaces themselves.

[SIGNATURE ON NEXT PAGE]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge, information, and belief, and that I signed this declaration on the date set forth below.

*Jeffrey Sladkus*

Jeffrey B. Sladkus
Ga. Bar No. 651220

Date: February 6, 2024.

# Exhibit 1

Marilyn Monroe Marilyn Monroe ×
sellerdefense.cn/marilyn-monroe/
Bill4Time NetDocs USPTO TSDR TBMP TTABVUE TMEP TFSR ESTTA Westlaw Date Calculator Tutorials — Web3 E... N.D.Ga. Local Rules Intermedia Webmail
Incognito Update

## MARILYN MONROE MARILYN MONROE

front page / Marilyn Monroe...

**Brand Owner:** The Estate of Marilyn Monroe, LLC

**Prosecution Type:** Trademark

**Representing law firm:** THE SLADKUS LAW GROUP-Georgia-USA

**History of incidents:**

| prosecution time | case number | law firm | brand | Brand side |
|---|---|---|---|---|
| ? | 22-cv-1977 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |
| ? | 22-cv-859 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |
| ? | 21-cv-3824 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |
| ? | 21-cv-2215 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |
| ? | 21-cv-2214 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |
| ? | 21-cv-2213 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |
| 2021/2/24 | 21-cv-788 | THE SLADKUS LAW GROUP | Marilyn Monroe Marilyn Monroe | The Estate of Marilyn Monroe, LLC |

**brand introduction:**

Word marks Marilyn Monroe, M Monroe, Marilyn, including handwritten signatures, cannot be used directly

Type and press enter...

SellerDefense WeChat Official Account

Reconciliation agency for American law firm

12:07 PM
3/8/2023











