## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **THE ESTATE OF MARILYN MONROE LLC,** | |
| *Plaintiff,* | **SEALED** |
| v. | Civil Action No. |
| **18_Jewellery, *et al.,*** | |
| *Defendants.* | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, AND ORDER TO SHOW CAUSE

**INTRODUCTION**

Plaintiff The Estate of Marilyn Monroe LLC ("Plaintiff") owns all intellectual property, including all trademark rights, of Marilyn Monroe's estate and is the current owner of the global trademark portfolio of the late Marilyn Monroe. Plaintiff owns numerous federal trademark registrations and common law rights for its trademarks, including MARILYN, MARILYN MONROE, DIAMONDS ARE A GIRL'S BEST FRIEND, and many others (collectively, "Plaintiff's Marks" or "Marks"). Plaintiff has invested considerable time and money building up tremendous goodwill in its trademarks and related goods. Plaintiff takes great care to protect its intellectual property rights and spends considerable time and money enforcing them against infringers and counterfeiters. Despite these efforts, infringers and counterfeiters proliferate.

Each Defendant is believed to be a non-U.S. entity, association, or individual, located in China or elsewhere in Asia, each of whom sells, offers for sale, distributes, and/or advertises goods through its virtual storefronts on various e-commerce marketplaces, such as Alibaba, AliExpress, Amazon, DHGate, eBay, Etsy, Joom, Printerval, Temu, Walmart, and Wish (each a "Marketplace" and collectively the "Marketplaces"). Each Defendant uses in commerce a reproduction, counterfeit, copy, or colorable imitation of one or more of Plaintiff's

2

Marks on or in connection with the sale, offer for sale, distribution, or advertising of goods on their respective virtual storefronts on the Marketplaces ("Counterfeit Products"). Defendants' Counterfeit Products deprive Plaintiff of the opportunity to exercise quality control over the goods offered under or in connection with its valuable trademarks and thereby severely harm Plaintiff's valuable brand, exclusive rights, and the goodwill associated with Plaintiff's Marks. Plaintiff, therefore, seeks an *ex parte* temporary restraining order shutting down Defendants' virtual storefronts on the Marketplaces and freezing Defendants' financial accounts tied thereto.

## FACTUAL BACKGROUND

## I.    PLAINTIFF'S PRODUCTS AND MARKS.

Plaintiff is a limited liability company organized under the laws of Delaware. Plaintiff owns all intellectual property, including all trademark rights, of Marilyn Monroe's estate and is the current owner of the global trademark portfolio of the late Marilyn Monroe. Marilyn Monroe ("Monroe") was an actress, model, and singer whose films grossed approximately $200 million by the time of her death in 1962. Subsequently, The American Film Institute named her the sixth greatest female screen legend in American film history, Smithsonian Magazine named her as one of the 100 Most Significant Americans of All Time, and the

book *The Guide to United States Popular Culture* has called her an "icon of American popular culture . . . [whose] rivals in popularity include Elvis Presley and Mickey Mouse[.]" (Declaration of Kevin Clarke ¶¶ 4-5.)

Plaintiff owns numerous registered and common law trademarks ( "Plaintiff's Marks" or "the Marks") including MARILYN, MARILYN MONROE, DIAMONDS ARE A GIRL'S BEST FRIEND, and many others. Plaintiff has used Plaintiff's Marks in commerce for decades, some as early as 1986, in connection with a wide variety of consumer products. Plaintiff owns numerous federal trademark registrations for Plaintiff's Marks, including, but not limited to, the following:

| Mark | U.S. Federal Reg. Nos. |
|---|---|
| MARILYN MONROE | 2985935 |
| MARILYN MONROE | 2223599 |
| MARILYN MONROE | 4419275 |
| MARILYN MONROE | 2180950 |
| MARILYN MONROE | 4743834 |
| MARILYN | 4040943 |
| DIAMONDS ARE A GIRL'S BEST FRIEND | 3269035 |

True and correct copies of the certificates of registration for these trademarks and others are attached as Exhibit A to the Complaint. (*Id.* ¶¶ 6-9.)

## II.    PLAINTIFF'S ONGOING BATTLE AGAINST COUNTERFEITERS.

Due to Monroe's worldwide reputation, products bearing Plaintiff's Marks are subject to frequent counterfeiting. Many third parties use Plaintiff's Marks, both online and offline, without authorization, on or in connection with the advertising and sale of a variety of products. The sale of Counterfeit Products poses a real threat to the brand, the sustainability of Plaintiff's business, and to the individuals and companies who unwittingly purchase them. Counterfeit Products deprive Plaintiff of the opportunity to exercise quality control, a hallmark of trademark ownership. Counterfeit Products are of an unknown and often inferior quality. Such products are manufactured under unknown circumstances, from unknown materials, and are not required to comply with federal safety or labeling standards. Products that do not meet Plaintiff's quality standards erode the brand's valuable reputation and goodwill. If consumers are dissatisfied with the quality of the counterfeit product they purchase, that displeasure will be attributed to Plaintiff's brand. The availability of Counterfeit Products also costs Plaintiff considerable lost sales and harms its relationships with authorized licensees. Unauthorized use of Plaintiff's Marks also devalues the brand and corrodes Plaintiff's exclusive rights in Plaintiff's Marks. (*Id.* ¶¶ 10-11.)

Plaintiff spends considerable time and resources fighting infringers and counterfeiters. Plaintiff regularly uses standard notice and takedown procedures to remove counterfeit and infringing goods from the Internet. Despite Plaintiff's efforts, Counterfeit Products continue to be readily available through the Marketplaces. Marketplace intellectual property rights ("IPR") notice and takedown mechanisms have not been fully effectual in Plaintiff's continuing fight against the marketing and sale of Counterfeit Products. (*Id.* ¶ 12.)

If a Marketplace bans a seller because of repeat IPR infringement complaints, the seller can easily establish a new identity, set up a new virtual storefront and resume selling Counterfeit Products in little time. Most Marketplaces do not require sellers to provide complete or accurate physical contact information, and others allow the sellers to operate with complete anonymity. (Declaration of Jeffrey B. Sladkus ¶¶ 10-15.) With such anonymity, sellers can advertise and sell counterfeit and/or infringing goods without any risk of an adverse judgment. This allows these sellers to destroy any evidence of their unlawful conduct and quickly transfer funds in the event of a legal proceeding. To successfully shut these sellers down and afford an aggrieved party the opportunity to obtain some type of remedy under the prevailing U.S. trademark laws, it is exceedingly important that the targets remain unaware that they are the subject of

anti-counterfeiting measures; otherwise, they will disappear without a trace. (*Id.* ¶¶ 16-19.)

Plaintiff can usually identify Counterfeit Products by visual inspection, including the country of origin, seller identity, type, labeling, packaging materials, and/or price at which the products are sold. With the assistance of The Sladkus Law Group, it has been confirmed that each Defendant is selling non-genuine products bearing or in conjunction with one or more marks that are identical or confusingly similar to at least one of Plaintiff's Marks. (D.I. 1, Exhibit B.) None of the Defendants is, or has ever been, authorized to sell, offer for sale, distribute, or advertise any goods under or in connection with any of Plaintiff's Marks. (Declaration of Kevin Clarke ¶ 13.)

## LEGAL ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS.

A court will issue a temporary restraining order where the requesting party demonstrates the following four factors: (1) it has a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury if the order is not granted; (3) that the threatened injury to the plaintiff outweighs the harm the relief would inflict on the non-movant; and (4) entry of the order would serve the public interest. *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223,

1225-26 (11th Cir. 2005); *Cathedral Art Metal Co. v. Divinity Boutique, LLC*, 2018 WL 566510 at *4 (N.D. Ga. 2018) (applying four-part test and granting preliminary injunction in a Lanham Act case).

Courts may issue a temporary restraining order without notice to the adverse party where the facts in an affidavit demonstrate the moving party will suffer immediate and irreparable injury, loss, or damage before the adverse party can be heard in opposition and the movant's attorney certifies in writing the reasons why notice should not be required. FED. R. CIV. P. 65(b)(1). Where a defendant's identity is known and notice can be feasibly given, the court may still grant an *ex parte* seizure order if providing notice to the defendant would render fruitless the further prosecution of the action. *AT&T Broadband v. Tech Communications, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004). "The weight of authority around the country appears to favor the granting of *ex parte* seizure orders in trademark counterfeiting cases, where fake versions of well-known brands are deliberately passed off to the public as the genuine article." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 249-50 (S.D. Fla. 1982). The justification for an *ex parte* seizure order is even more compelling where a significant amount of evidence pertaining to the counterfeiting activity is in electronic form, and therefore subject to quick, easy,

and untraceable destruction by the Defendants. *Dell Inc. v. BelgiumDomains, LLC*,
2007 WL 6862341 at *2 (S.D. Fla. 2007); *see also Chanel, Inc. v.
Chanel255.ORG, et al.*, 2012 WL 12845630 at *5 (S.D. Fla. 2012).

Requests for equitable relief invoke the court's inherent equitable powers to
order preliminary injunctive relief, including an asset freeze, in order to assure the
availability of permanent relief. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*,
51 F.3d 982, 987 (11th Cir. 1995) (affirming district court's asset freeze order
where plaintiff sought permanent injunction and equitable remedy of defendants'
profits from counterfeiting). Plaintiff's requests for permanent injunctive relief and
disgorgement of the Defendants' profits are requests for relief in equity. *Id*. Such
asset freezes are particularly appropriate against sellers of counterfeit goods who
are likely to hide their ill-gotten profits if their assets are not seized. *Reebok
Intern., Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992)
(affirming asset freeze order against seller of counterfeit goods).

## II.    THE COURT HAS JURISDICTION OVER DEFENDANTS.

This Court has jurisdiction over the Defendants pursuant to Fed. R. Civ. P.
4(k)(2), which provides jurisdiction over a foreign defendant that is not subject to
the jurisdiction of any state's court of general jurisdiction where exercising
jurisdiction is consistent with the United States Constitution and its laws. Each

Defendant has offered Counterfeit Products for sale throughout the United States, including in Georgia. Each Defendant is willing to engage in commercial transactions with residents of the United States, ship Counterfeit Products to the United States, and receive payment in U.S. Dollars. Therefore, it is reasonable for the Defendants to expect that they may be sued in the United States. *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1542-47 (11th Cir. 1997) (holding court had personal jurisdiction over foreign corporation where defendant placed ads for securities in two airlines' in-flight magazines, mailed offering materials directly to U.S. investors, and maintained U.S. bank accounts to receive payment from investors.); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355-58 (11th Cir. 2013) (affirming jurisdiction over non-resident who sold counterfeit products through fully-interactive website).

Moreover, using a suitable pretext, Plaintiff's counsel searched for Plaintiff's branded goods on the various Marketplaces, identified Stores advertising merchandise bearing counterfeit and/or infringing copies of Plaintiff's Marks, and confirmed that each of the Stores was willing and able to ship these Counterfeit Products to Plaintiff's counsel in the United States. Each of the Marketplaces accepts payment on behalf of the Stores for these goods in U.S. dollars. Each Defendant advertised its willingness and ability to sell these

Counterfeit Products to customers in the United States, including in this judicial district, thereby purposefully directing its commercial activities here. (Declaration of Jeffrey B. Sladkus ¶¶ 7-8.)

## III.   PLAINTIFF IS ENTITLED TO AN *EX PARTE* TRO.

There is no question that the Defendants are marketing and selling unauthorized goods bearing counterfeit copies of Plaintiff's Marks or otherwise using Plaintiff's Marks, or colorable imitations thereof, in a manner that is likely to cause consumer confusion. Plaintiff is entitled to an immediate restraining order prohibiting Defendants from continuing to infringe on its valuable trademarks and to protect unwary consumers from unauthorized and likely inferior products.

### A.   Plaintiff Is Likely To Succeed On Its Claims.

Plaintiff owns numerous federally registered trademarks, including, but not limited to, MARILYN, MARILYN MONROE, and DIAMONDS ARE A GIRL'S BEST FRIEND. True and correct copies of the certificates of registration for these and other trademarks are attached as Exhibit A to the Complaint. The certificates of registration are *prima facie* evidence of the validity of the registered mark and the registration of the mark, Plaintiff's ownership of the mark, and Plaintiff's exclusive right to use the registered mark in commerce on or in connection with the goods in the certificates. 15 U.S.C. § 1057(b).

To determine whether Defendants are infringing Plaintiff's Marks, the Court will consider the strength of Plaintiff's Marks, the similarity of the marks, and the similarity of the goods. Plaintiff's Marks are inherently distinctive, have been registered for decades, and, as a result, have achieved significant recognition among the relevant consuming public.

Plaintiff and/or the undersigned counsel have reviewed all of the product listings at issue for each Defendant and confirmed that each Defendant is using a counterfeit and/or colorable imitation of one or more of Plaintiff's Marks (i) on non-genuine reproductions of Plaintiff's goods, or (ii) in association with the marketing or sale of other goods in such a manner as to confuse customers into believing the goods are genuine. See Exhibit B to the Complaint.

## B.    Plaintiff Is Likely To Suffer Irreparable Harm.

The Lanham Act, 15 U.S.C. § 1116(a), includes "a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits," in cases where, as here, the plaintiff is seeking a temporary restraining order or a preliminary injunction. As such, having demonstrated a likelihood of success on the merits, as discussed in Section III.A., above, Plaintiff is automatically entitled to a presumption of irreparable harm, thereby satisfying the second factor of the temporary restraining order analysis.

Even without the presumption of irreparable harm, however, Plaintiff can easily satisfy this factor. Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. *Ferrellgas Partners, L.P*, 143 Fed. Appx. 180, 190 (11th Cir. 2005). Evidence that a defendant sells a line of infringing products intending to capitalize on the plaintiff's goodwill constitutes "overwhelming evidence" that the plaintiff is likely to suffer irreparable harm. *Cathedra Art Metal Co. v. Divinity Boutique, LLC*, 2018 WL 2356181 at * 2 (N.D. Ga. 2018); *see also InternetShopsInc.com v. Six C Consulting, Inc.*, No. 1:09–cv–698–JEC, 2011 WL 1113445, at *6 (N.D. Ga. Mar. 24, 2011) (dilution of goodwill, loss of control of reputation, and loss of trade are sufficient to find irreparable injury). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Crossfit, Inc. v. Quinnie*, 232 F.Supp.3d 1295, 1316 (N.D. Ga. 2017).

Plaintiff has spent considerable time, money, and effort building its valuable brand. The proliferation of counterfeit and/or infringing copies of Plaintiff's goods erodes the distinctiveness of Plaintiff's Marks and diminishes their value and associated goodwill. Because Plaintiff cannot control the quality of counterfeit or infringing goods, the sale of inferior counterfeit or infringing goods by Defendants

13

will have a materially adverse effect on Plaintiff's business reputation and the

goodwill associated with Plaintiff's Marks. This is sufficient to establish a

likelihood of irreparable harm. *Noorani Trading Inc. v. Bijani*, No. 17-1344, 2017

WL 8292437 at *9 (N.D. Ga. May 4, 2017). The widespread and unauthorized use

of Plaintiff's Marks in the marketing, offering for sale, and sale of counterfeit

and/or infringing goods threatens the extensive goodwill associated with Plaintiff's

business and Plaintiff's Marks, and will continue to cannibalize the sale of

Plaintiff's genuine goods. There is a significant threat that Plaintiff will suffer

irreparable harm without an injunction. *Mud Pie, LLC v. Deck the Halls, Y'all,*

*LLC*, No. 17-2789, 2017 WL 8942387 at *3 (N.D. Ga. 2017).

### C.    The Balance Of Hardships Favors Plaintiff.

If Defendants are permitted to continue to sell the Counterfeit Products,

Plaintiff's reputation and the value of the goodwill associated with its Marks will

be irreparably damaged (as set forth above). Moreover, counterfeiters and

infringers such as Defendants capitalize off the goodwill that Plaintiff has built in

its goods and brand while selling inferior and sometimes dangerous goods to

unsuspecting consumers. In contrast, enjoining Defendants from selling counterfeit

and/or infringing goods poses little to no risk of damaging the goodwill, if any,

associated with the Defendants. Any harm Defendants may suffer is purely

monetary and is therefore compensable, unlike the harm that Plaintiff will continue to suffer.

### D.    An Injunction Will Serve The Public Interest.

Finally, "the public interest is served by preventing consumer confusion in the marketplace." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001). Moreover, Defendants' goods are of an unknown and likely inferior quality and manufactured under unknown circumstances from unknown materials. Defendants' goods are not required to meet any federal or state safety requirements and likely do not include the required federal or state labels that allow customers to locate the manufacturer in the event of a problem. Keeping such products out of the hands of consumers, therefore, serves public safety interests. Accordingly, the public interest weighs in favor of an injunction.

### E.    The TRO Should Issue Without Notice.

The Marketplaces allow sellers of counterfeit and/or infringing goods, such as Defendants, to operate anonymously. From the undersigned counsel's considerable experience fighting counterfeiters and infringers, when a Marketplace does require sellers to provide physical contact information, this information is consistently inaccurate, and sellers routinely provide false, incomplete, or misleading contact information. (Declaration of Jeffrey B. Sladkus ¶¶ 13-15.)

Moreover, the Court may grant an *ex parte* seizure order if providing notice to the Defendants would render fruitless the further prosecution of the action. *AT&T Broadband v. Tech Communications, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004). This is particularly true when combatting counterfeiters. "The weight of authority around the country appears to favor the granting of *ex parte* seizure orders in trademark counterfeiting cases, where fake versions of well-known brands are deliberately passed off to the public as the genuine article." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 249-50 (S.D. Fla. 1982) (citing numerous cases). The justification for an *ex parte* seizure order is even more compelling where a significant amount of evidence pertaining to the counterfeiting activity is in electronic form, and therefore subject to quick, easy, and untraceable destruction by the Defendants. *Dell Inc. v. BelgiumDomains, LLC*, 2007 WL 6862341 at *2 (S.D. Fla. 2007); *see also Chanel, Inc. v. Chanel255.ORG, et al.*, 2012 WL 12845630 at *5 (S.D. Fla. 2012).

Defendants sell their counterfeit and/or infringing goods to customers in the United States exclusively online and accept payment only through on-line payment processors. Defendants can easily remove all evidence of their counterfeit goods from their virtual storefronts and transfer any ill-gotten funds into foreign bank accounts, where they are beyond this Court's reach. *See F.T.C. v. Atlantex Assoc.*,

872 F.2d 966, 968 (11th Cir. 1989) (affirming *ex parte* TRO and asset freeze order

against party accused of deceptive trade practices to preserve funds for possible

restitution). Therefore, it is imperative that Defendants not have advanced notice of

any TRO.

## IV.    THE COURT MAY ISSUE A TRO WITHOUT A BOND.

Federal Rule of Civil Procedure 65(c) requires that an applicant for a TRO

or preliminary injunction provide security against the potential effects of a

wrongfully-issued injunction. FED. R. CIV. P. 65(c). However, it is well-established

in this Circuit that the amount of security required by the rule is a matter within the

discretion of the trial court, and the court may elect to require no security at all.

*BellSouth Telecom., Inc. v. MCIMetro Access Transmission Services, LLC*, 425

F.3d 964, 970 (11th Cir. 2005); *see also e.g. Georgia Coal. for People's Agenda,*

*Inc. v. Kemp*, 347 F. Supp.3d 1251, 1269 (N.D. Ga. 2018) (waiving bond

requirement and citing *BellSouth*); *AFC Enterprises, Inc. v. Rest. Grp. LLC*, 1:10-

CV-1772-TWT, 2010 WL 4537812, at *5 (N.D. Ga. Nov. 3, 2010) (rejecting

defendant's argument that preliminary injunction was improperly granted because

no bond was required); *DJR Associates, LLC v. Hammonds*, 241 F. Supp.3d 1208,

1234 (N.D. Ala. 2017) ("The Eleventh Circuit . . . has said at least twice (although

once in an unpublished opinion) that whether to set a bond as a condition to the

issuance of a preliminary injunction and in what amount are within the discretion of the trial court."). Courts have held that security is not required when the moving party has a high probability of succeeding on its claim. *University Books and Videos, Inc. v. Metropolitan Dade County*, 33 F. Supp.2d 1364, 1374 (S.D. Fla. 1999). Finally, the burden is on the defendant to request a bond and submit evidence regarding the appropriate amount. *Mud Pie, LLC v. Deck the Halls, Y'all, LLC*, Case No. 17-CV-2789, 2017 WL 8942387 (N.D. Ga. Sep. 27, 2017) (ordering defendants to provide reasonable estimate of potential lost sales, with supporting documentation, within one week of order).

Plaintiff has demonstrated that it has a substantial likelihood of succeeding on the merits of its claims. Therefore, this Court may waive the requirement for Plaintiff to post security. Alternatively, Plaintiff requests that the Court order Defendants to appear and provide an estimate of their potential lost sales, with supporting documentation, at the hearing on Plaintiff's motion for an order to show cause why a preliminary injunction should not issue.

## V.    AN ASSET FREEZE ORDER IS WARRANTED.

The Court should issue an order freezing Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces, including those in escrow, stored or processed by the Marketplaces, payment processors and/or

financial institutions. Orders freezing a defendant's assets are warranted to assure the availability of permanent relief. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). Such asset freezes are particularly appropriate against sellers of counterfeit goods who are likely to hide their ill-gotten profits if their assets are not seized. *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992).

A court can issue an asset freeze when its equitable authority is invoked. Plaintiff seeks a permanent injunction, an accounting of Defendants' profits pursuant to the Lanham Act, and an award of its attorney's fees. Plaintiff has thereby invoked this Court's equitable authority. *Levi Strauss*, 51 F.3d at 987; *Wheeless v. Gelzer*, 765 F. Supp. 741, 743 (N.D. Ga. 1991) (holding that request for attorneys' fees and monetary awards that are restitutionary in nature are equitable.)

In Plaintiff's experience, sellers of counterfeit goods are not deterred by the threat of injunctions or post-judgment damages. If only enjoined by a court, they simply set up a new account under a new alias and continue selling their counterfeit goods. Additionally, counterfeiters can quickly and easily transfer funds to foreign accounts. This makes it easy to hide profits from the sale of counterfeit goods, making it impossible for Plaintiff to have a meaningful

opportunity to seek redress in the form of permanent equitable relief, including disgorgement of profits.

Freezing Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces will also serve as a deterrent against future acts of counterfeiting and infringement. An equitable accounting of profits under the Lanham Act furthers the congressional purpose by making infringement unprofitable and is justified because it deprives defendants of unjust enrichment and provides a deterrent to similar activities in the future. *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988). Freezing the Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces will further the purposes of trademark law by making the sales of counterfeit and infringing goods unprofitable, depriving the Defendants of their unjust enrichment, and deterring future sales of counterfeit and infringing goods.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (a) grant the Temporary Restraining Order for a period of fourteen (14) days; (b) order the relevant financial institutions and Marketplaces, upon receiving notice, to freeze Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces, permanently remove any counterfeit or infringing product

listings, and disable Defendants' virtual storefronts until the Court rules on

Plaintiff's Motion for Preliminary Injunction; and (c) order that Defendants appear

before this court to show cause why a preliminary injunction should not issue and

provide an estimate of their lost sales with supporting documentation of on the date

set forth in the TRO.

Dated: February 6, 2024.

Respectfully submitted,

THE SLADKUS LAW GROUP

*s/Carrie A. Hanlon*
Carrie A. Hanlon
Ga. Bar No. 289725
E-mail: carrie@sladlaw.com
Jason H. Cooper
Ga. Bar No. 778884
E-mail: jason@sladlaw.com

1397 Carroll Drive
Atlanta, GA 30318
Telephone: (404) 252-0900
Facsimile: (404) 252-0970

**Attorneys for Plaintiff**

**CERTIFICATE OF FONT & SIZE SELECTION**

Pursuant to LR 7. 1(D), I certify that this paper was prepared with one of the

font and point selections approved by the Court in LR 5.1(B).

*s/Carrie A. Hanlon*
Carrie A. Hanlon